IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JOHN PAYNE SMITH,                      §
(TDCJ-CID #1331259)                    §
                                       §
                Petitioner,            §
VS.                                    §        CIVIL ACTION NO. H-09-2177
                                       §
RICK THALER,                           §
                Respondent.            §

## MEMORANDUM AND OPINION

Petitioner, John Payne Smith, seeks habeas corpus relief under 28 U.S.C. § 2254, challenging a conviction in the 182nd Judicial District Court of Harris County, Texas. Respondent filed a motion for summary judgment, (Docket Entry No. 11), and copies of the state court record. Smith has filed his response. (Docket Entry No. 16).

After consideration of the motion and response, the record, and applicable authorities, the court grants respondent's motion. The reasons for this ruling are stated below.

## I.    Background

A jury found Smith guilty of the felony offense of murder. (Cause Number 1020684). Smith pleaded true to the enhancement paragraphs relating to prior convictions for possession of a controlled substance in Cause Numbers 775329 and 846302. On September 19, 2005, the court sentenced Smith to forty-five years imprisonment. The Fourteenth Court of Appeals of Texas affirmed Smith's conviction on March 1, 2007. *Smith v. State,* No. 14-05-01032-CR, slip op. at 2 (Tex. App. -- Houston [14th Dist.] 2007, pet. ref'd)(not designated for publication). The Texas Court of Criminal Appeals refused Smith's petition for discretionary review on September 12, 2007. Smith

filed an application for state habeas corpus relief on September 4, 2008, which the Texas Court of Criminal Appeals denied without written order, on findings of the trial court, without a hearing on June 17, 2009. *Ex parte Smith,* Application No. 70,761-01 at cover.

On July 6, 2009, this court received Smith's federal petition. Smith contends that his conviction is void for the following reasons:

(1)    The evidence was legally insufficient to support his conviction;

(2)    The evidence was factually insufficient to support his conviction;

(3)    The trial court abused its discretion when:

      (A)    it "prejudiced and inflamed" the jury during voir dire by using a "hypothetical situation" to get the jury to commit to a specific set of facts before trial;

      (B)    it permitted the prosecutor to ask commitment questions over objection;

      (C)    it failed to order a mistrial, or charge the witnesses with contempt of court after Bryan Ware testified that the witnesses were conversing without the permission of the court after the rule had been invoked;

      (D)    it permitted the prosecutor to ask leading questions to a witness, over objection;

      (E)    it permitted hearsay evidence over timely objection;

      (F)    it permitted inconsistent statements from the State's witnesses; and

      (G)    it failed to follow the statutory requirements in TEX. CODE CRIM. PROC. art. 36.27, when it failed to notify Smith or trial counsel of questions asked by the jury during its deliberations; and

(4)    Trial counsel, Peter Justin, rendered ineffective assistance by:

      (A)    failing to pursue the Motion for Continuance;

(B)    failing to prepare for trial by not contacting and investigating all potential alibi witnesses;

(C)    failing to investigate or locate Bryan Ware, Linda Williams, John Wayne Griffen, Donna Cole, Maurice Woodard, Jimmy Stubblefield, Kesha Dsouza, and Bridget Sims;

(D)    failing to pursue discovery;

(E)    failing to object to the prosecutor's highly prejudicial remarks made during the opening statement;

(F)    failing to object to prejudicial testimony;

(G)    failing to object to a suggestive identification by Maurice Woodard, and failing to object to the in-court identification by Bryan Ware;

(H)    failing to interview each prosecuting witness;

(I)    failing to object to inadmissible evidence;

(J)    failing to present impeachment evidence during the course of the trial;

(K)    failing to prepare a factual background of the evidence during his closing argument;

(L)    failing to object to the jury instructions;

(M)    failing to interview the police officer who took Smith's statement; and

(N)    failing to object to suggestive identification procedures which pertained to a witness to the alleged offense.

(Docket Entry No. 1, Petition for Writ of Habeas Corpus, pp. 7-8).

## II.     The Applicable Legal Standards

This court reviews Smith's petition for writ of habeas corpus under the federal habeas statutes, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2254; *Woods v. Cockrell*, 307 F.3d 353, 356 (5th Cir. 2002); *Nobles v. Johnson*, 127 F.3d 409, 413 (5th Cir. 1997), citing *Lindh v. Murphy*, 521 U.S. 320 (1997).

Sections 2254(d)(1) and (2) of AEDPA set out the standards of review for questions of fact, questions of law, and mixed questions of fact and law that result in an adjudication on the merits. An adjudication on the merits "is a term of art that refers to whether a court's disposition of the case is substantive, as opposed to procedural." *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000).  A state-court determination of questions of law and mixed questions of law and fact is reviewed under 28 U.S.C. § 2254(d)(1) and receives deference unless it "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000).  A state-court decision is "contrary to" Supreme Court precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. *Williams v. Taylor,* 120 S. Ct. 1495 (2000).  A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 1495.  Questions of fact found by the state court are "presumed to be correct . . . and [receive] deference . . . unless it 'was based on an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding.'" *Hill*, 210 F.3d at 485 (quoting 28 U.S.C. § 2254(d)(2)).

A state court's factual findings are entitled to deference on federal habeas corpus review and are presumed correct under section 2254(e)(1) unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citing *Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005) and 28 U.S.C. § 2254(e)(1)). This deference extends not only to express findings of fact, but to the implicit findings of the state court as well. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004)).

While, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson,* 202 F.3d 760, 764 (5th Cir.), *cert. denied,* 531 U.S. 831 (2000), the rule applies only to the extent that it does not conflict with the habeas rules. Section 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party. Unless the petitioner can "rebut[ ] the presumption of correctness by clear and convincing evidence" as to the state court's findings of fact, those findings must be accepted as correct. *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002).

Smith is proceeding *pro se.* A *pro se* habeas petition is construed liberally and not held to the same stringent and rigorous standards as pleadings filed by lawyers. *See Martin v. Maxey,* 98 F.3d 844, 847 n.4 (5th Cir. 1996); *Guidroz v. Lynaugh*, 852 F.2d 832, 834 (5th Cir. 1988); *Woodall v. Foti,* 648 F.2d 268, 271 (5th Cir. Unit A June 1981). This court broadly interprets Smith's state

On cross-examination, counsel asked if Officer Bailey saw anyone that had been cut; the number of shell casings in the parking lot; the lighting in the parking lot; and whether any of the people present in the parking lot had their hands bagged for gunshot residue.

E.P. Aguilera testified that he was a Houston police officer assigned to the crime scene unit of the homicide division. (Reporter's Record, Vol. IV, p. 77). He was responsible for searching for evidence, documenting it, and collecting it. He arrived at 3535 Pinemont at 12:32 in the morning. (*Id.* at 82).

Officer Aguilera testified that from the lighting in the parking lot, he was able to identify fellow officers and the crime scene. After talking with Detective Baimbridge, Officer Aguilera began locating evidence. (*Id.* at 85). Officer Aguilera photographed the scene and prepared a diagram of the scene. (*Id.* at 87). Officer Aguilera testified that he recovered spent shell casings and a bloody shirt from the scene. He also documented damage to a blue truck as a result of a bullet, and he photographed injuries to Woodard and Dsouza. (*Id.* at 100). He determined that the casings came from a semi-automatic weapon. (*Id.* at 105).

On cross-examination, counsel asked Officer Aguilera whether he searched for evidence in Dirty D's; whether the casings could have been moved; whether Dsouza's hands had been bagged for gunshot residue; whether Woodard's hands were bagged for gunshot residue; and whether there was adequate lighting in the parking lot.

Kesha Dsouza testified that she was the mother of three girls, and she was a homemaker. (Reporter's Record, Vol. IV, pp. 128-29). She testified that her brother was Maurice Woodard. She went to Dirty D's because Woodard's girlfriend, Bridget Sims, worked there. Dsouza testified that she went to Dirty D's to participate in the pool tournaments. (*Id.* at 131). Dsouza testified that she

and federal habeas petitions. *Bledsue v. Johnson,* 188 F.3d 250, 255 (5th Cir. 1999). Other than

listing his grounds for federal habeas review, Smith does not set forth the factual bases of his claims.

The court has reviewed Smith's state applications and memoranda filed in the state habeas court to

ascertain the factual bases of his claims.

## III.    Statement of Facts

Bridgit Sims testified that she was a bus driver for Aldine Independent School District and

had been driving for them approximately ten years at the time of trial. (Reporter's Record, Vol. III,

p. 12). Over a period of a year, she worked intermittently as a waitress and bartender at Dirty D's

saloon, a small neighborhood club on the north side of Houston. (*Id.* at 13). On August 11, 2004,

Sims had been dating Maurice Woodard for about one and one-half years. (*Id.* at 14). She also knew

Woodard's sister, Kesha Dsouza. Sims testified that she saw Ambrose Carper, the Complainant, on

the night of August 11, 2004. She explained that they socialized about three times a week at clubs.

Sims testified that she knew a man named John Wayne Griffen, or Duke, and that Duke dated Linda

Williams. (*Id.* at 19). Sims identified Smith as Duke's son. Sims saw Duke arguing with Linda in

raised voices. The Complainant was seated across the table from Sims.

At approximately 11:30 p.m., Sims stepped out into the parking lot. She remained standing

near the door to Dirty D's, and she saw Duke, Woodard, and Dsouza talking in the parking lot. She

then saw the Complainant running along the back of the parking lot, and Smith was pointing a gun

at him and shooting. (*Id.* at 29). Sims testified that the parking lot was well-lit, and she could see

what was happening. She never saw the Complainant with a gun, but she clearly saw Smith with

a gun in his hand, and she saw him shoot at the Complainant. (*Id.* at 32). Smith fired three shots,

and the Complainant collapsed in front of the tire shop. (*Id.* at 33). Sims approached the

Complainant and saw that he was bleeding and gasping for breath. (*Id.* at 34). She testified that approximately fifteen to twenty people were in the parking lot at the time of the shooting. She never saw Smith speak to the Complainant either in Dirty D's or in the parking lot. (*Id.* at 35). Sims went into Dirty D's to inform Complainant's girlfriend about the shooting. Sims testified that she was present when the police interviewed Woodard, but she never told the police what she had seen. (*Id.* at 38). She testified that the police never asked her if she saw anything. She testified that Smith was the only person in the parking lot with a gun, and she never saw anyone else with any type of weapon. (*Id.* at 38).

On cross-examination, counsel asked why Sims did not tell the police what she had seen; why she waited for more than a year to speak to the prosecutor; how she knew when the shooting took place; if she drank any alcohol that night; if she saw Woodard drink alcohol; if the Complainant was drinking alcohol; how long she had known Duke; the ambient lighting in the parking lot; the nature of the argument between Duke and Linda; her location at the time of the shooting; how many shots were fired; the layout of the parking lot; how many people were in the parking lot; where she was when the police interviewed Woodard; whether she saw Duke in the parking lot; and whether Woodard had a knife.

Earl E. Bailey testified that he was a patrol officer with the Houston Police Department. (Reporter's Record, Vol. IV, p. 54). At 11:15 p.m. on August 11, 2004, he was dispatched to the 3500 block of Pinemont. When he arrived, he saw a black male being loaded into the ambulance. Upon learning that the Complainant had died, Officer Bailey began processing the scene as a murder investigation. (*Id.* at 58-59). Officer Bailey maintained the integrity of the scene until the Homicide investigations officers arrived. (*Id.* at 64).

and her brother drove to Dirty D's, and Sims drove in a separate car. They arrived at about 9:00 p.m.

Dsouza testified that she had about three beers, and left after the tournament at 11:00 p.m. (*Id.* at

136). She testified that Woodard took her cell phone and went outside Dirty D's. Dsouza wanted

to make a call, so she too went outside into the parking lot. (*Id.* at 137). Dsouza went to speak to

Donna Cole, a friend she had known for nine years. Cole was near the tire shop. Dsouza explained

that Duke was dating Linda Williams, and Williams was a friend of Cole. (*Id.* at 140). She saw

Woodard talking on the phone. Cole and Duke were arguing when Dsouza approached them. (*Id.*

at 142). There were about seven people in the parking lot, and the lighting in the parking lot was

sufficient for her to see people.

Dsouza became involved in the argument between Duke and Cole. At this point, Woodard

approached them. Then Duke began arguing with Woodard. (*Id.* at 144-45). Dsouza testified that

Woodard did not have a weapon. She saw that Duke had a beer bottle, and it looked like he was

going to hit Woodard with the bottle. Dsouza, Woodard, and Donna approached the door to Dirty

D's. Duke and Smith came toward them suddenly. (*Id.* at 150). Dsouza was standing behind her

brother as they neared the entrance to Dirty D's. Dsouza turned around and heard Duke and Smith

yelling. Dsouza saw Smith carrying a big silver gun. Dsouza testified that State's Exhibit 34 looked

liked the gun Smith was holding. (*Id.* at 152). Smith asked who was messing with his dad. Smith

reached over and struck Woodard on the cheek with the gun. (*Id.* at 155). Duke grabbed Dsouza

by the hair and pushed her against the wall and hit her on the nose. (*Id.* at 156). The owner of Dirty

D's came to break up the fight, and she heard gunshots. Dsouza testified that she had known the

Complainant for about two years from playing pool. She had seen him in Dirty D's that night. She

did not observe him having any problems with anyone in the saloon. (*Id.* at 158). She looked up and

saw Smith running through the parking lot and shooting. (*Id.* at 159). Dsouza thought Smith was shooting at her brother, Woodard. She recognized Smith because she had just seen him in the doorway of Dirty D's. Dsouza testified that she never saw anyone else with a gun that night. (*Id.* at 161). She heard three gunshots, but she never saw who was being shot. She later saw Cole come into the saloon with a cut on her knee. (*Id.* at 162). She never saw Duke or Smith again that night. (*Id.* at 163). She learned that the Complainant was shot after she came into Dirty D's. She never saw the Complainant have any problem with Smith. (*Id.* at 164). She sustained injuries to her nose and elbow.

Dsouza identified State's Exhibit 40 as the photo array shown her by Sergeant Baimbridge. She chose the photograph of Smith in position five as the person who fired the gun on August 11, 2004. (*Id.* at 168-69). Dsouza clarified that she never said that she saw the Complainant get shot. (*Id.* at 227).

On cross-examination, counsel asked if Dsouza had testified at Duke's parole hearing; whether she talked to her brother about what she had seen; how many officers she spoke to on the night of the shooting; how many times she spoke to the prosecutor before trial; whether she was familiar with guns; whether she saw the shooting; how many gunshots she heard; whether she saw Smith hit Woodard with a gun; whether she saw the Complainant get shot; whether she saw anyone else shooting that night; whether she saw her brother pull a knife; whether she helped her brother dispose of the knife; and whether her brother was drinking.

Dr. Dwayne Wolf testified that he was the Deputy Chief Medical Examiner for Harris County. He explained that a forensic pathologist is essentially a medical doctor who's trained in death investigation. (Reporter's Record, Vol. IV, p. 189). He testified that he was familiar with an

autopsy that was performed on Ambrose Carper.  Dr. Wolf testified that the Complainant had a gunshot entrance wound in the lower left side of the back.  This bullet went back-to-front, left-to-right and upward.  It entered the back and passed through the vertebral column.  The bullet severed the spinal cord as it came up on the other side.  It continued up through the right chest cavity, perforating the lower lobe of the right lung and the upper lobe of the right lung before exiting on the right, upper anterior front side of the chest. (*Id.* at 195-96).  The Complainant had some superficial abrasion injuries and scrape marks from collapsing face-first, becoming instantly paralyzed, and dropping on the ground.  He testified that the cause of death was a gunshot wound to the back.  The Complainant sustained direct neurologic injury, respiratory damage, and eventually circulatory collapse. (*Id.* at 198).  A toxicology report showed that the Complainant had a blood alcohol level of .14.  Dr. Wolf testified that the path of the bullet was consistent with the Complainant being in front of the gun that shot him and that he was shot from the back.  The injury was consistent with a gunshot from a handgun.

On cross-examination, counsel asked if the blood alcohol level was twice the legal limit and whether the Complainant had tattoos on his body.

Donna Cole testified that she was thirty-two years old, a single mother of four girls, and a home healthcare provider.  (Reporter's Record, Vol. IV, p. 231).  She had known Dsouza for about eight or nine years. (*Id.* at 232).  She had known Linda Williams since elementary school, and she had known Duke for a short time.  She went to Dirty D's to meet Williams, Williams left, and Cole remained at Dirty D's.  Cole testified that Duke began speaking to Cole in a derogatory manner.  While Cole was arguing with Duke, Dsouza approached.  Thereafter, Woodard approached and began calling to his sister, Dsouza.  Cole said she did not see Woodard with a knife.  The argument

between Dsouza, Woodard, and Duke escalated.  Smith came near Duke and said that no one could

"f—" with his daddy.  (*Id.* at 241).  Cole testified that she saw Smith go to a burgundy car and return

with a big silver gun in hand.  Again, Smith said no one was going to "f—" with his daddy.  Duke

asked for the gun, but Smith did not give it to him. (*Id.* at 248).  Smith reached over Dsouza and hit

Woodard with the gun.  Cole saw the Complainant pass by Smith.  The Complainant made a gesture

with his hands to show that he did not have a weapon.  Smith followed the Complainant and shot

him.  (*Id.* at 252-53).  Cole did not know if the Complainant and Smith exchanged any words.  She

saw Smith fire several random shots, then he fired at the Complainant.  Cole saw the Complainant

fall to the ground, and she saw Smith get in his car and drive away.  Duke approached the door to

Dirty D's and hit Cole.  Cole fell to the ground, and when she stood up, she realized that she had

been cut on the leg.  She cut Duke with a rock.  She viewed a photograph array and identified Smith

as the shooter.  (*Id.* at 260).

 Cole testified that she had a cut on her thigh, her elbow was hurt, and her hand had a cut.

People inside the club helped to clean her up.  She never saw Duke or Smith in the club again that

night.  While waiting to be taken to the hospital, Cole did not see anyone inside the club concealing

weapons.  The father of her children then took Cole to the hospital.  Cole testified that when Smith

approached with the gun, Duke was encouraging Smith by saying, "Go ahead and shoot that - -."

Cole testified that she was on deferred adjudication for aggravated assault with a deadly weapon in

2000.

 On cross-examination, counsel asked Cole if she was on deferred adjudication for shooting

someone; whether going to Dirty D's was a violation of her probation; whether she used a knife to

cut Duke; whether she told the police that Duke was a drug dealer and convicted felon; whether she told the police she heard six to eight shots fired; and when she first saw the Complainant that night.

Nora Hailey testified that she was the mother of the Complainant. (Reporter's Record, Vol. V, p. 62). She testified that the Complainant had two daughters.

Demetrius Maurice Woodard testified that he was thirty-five years old and worked for a pharmaceutical plant. (Reporter's Record, Vol. V, p. 66). He was the father of three girls and older brother of Dsouza. He met the Complainant a few years earlier while shooting pool. He testified that he drove Dsouza to Dirty D's on August 11, 2004, and his girlfriend, Sims, followed in her own car. They arrived at about 8:45 p.m. (*Id.* at 68). An hour later, Woodard borrowed Dsouza's cell phone and went outside to make a call. He walked across the street to his truck and made a call for about five minutes. He saw Dsouza in the parking lot. He also saw Williams and Duke arguing, and then he saw Williams leave in someone's car. He heard Dsouza arguing, so he went to the group. The argument became heated, and Duke was yelling at Dsouza. Then Duke and Woodard exchanged words. Duke held a beer bottle by the neck and held it in a threatening manner. (*Id.* at 78). Woodard testified that he normally carried a knife for work. He went to his truck to retrieve his knife. He identified State's Exhibit No. 41 as his knife. Woodard realized the knife was in his pocket and returned to the group. (*Id.* at 82). Woodard held his knife in his left hand, but he never pointed it at anyone. Duke was still holding the bottle. Duke, seeing the knife, stepped back. Woodard and Dsouza made their way back to Dirty D's. As Woodard, Dsouza, and Cole neared the door, Smith suddenly appeared with a gun in hand. Smith said that no one would "f—k" with his dad. Woodard identified State's Exhibit 34 as the gun carried by Smith. When Woodard saw the gun, Woodard started moving backwards. (*Id.* at 91). Woodard did not see anyone else in the

parking lot with a gun.  Woodard saw the Complainant.  The Complainant had told Woodard to calm down.  Woodard was hit hard in the face.  Woodard saw the Complainant running outside, and the door to the club closed.  Woodard was inside the club, and he heard three or four gunshots.  He did not see who was shot.  (*Id.* at 96).  Woodard then went outside the club and saw that the Complainant had been shot.  Woodard spoke to the police and gave a statement.  Woodard never saw anyone other than Smith with a gun. (*Id.* at 99).  Woodard never saw anyone concealing weapons inside Dirty D's.

Woodard testified that he went downtown to give his statement to the police.  As Woodard was walking past some cubicles, Woodard saw the photograph of Smith.  Woodard said to the officer, "Oh, I see you caught him."  The officer said that Woodard was not supposed to see the picture.  Woodard identified State's Exhibit No. 42 as the photograph he saw in the Homicide Division.  Woodard signed and dated the photograph, showing that he had viewed the photograph.  Woodard testified that the officer never directed Woodard to look in the direction of the photograph.  Woodard then gave his written statement. (*Id.* at 104).

On cross-examination, counsel asked if Woodard had an opportunity to correct his statement to the police; how much he drank that night; how Duke was holding the beer bottle; whether he used his knife for protection; when did he first see the gun; how many shots did he say he heard; and whether his hands were bagged for gunshot residue.

Bryan Ware testified that he had not spoken to any of the other witnesses about his testimony.  (Reporter's Record, Vol. V, p. 156).  He had been doing construction work for twenty years.  On August 11, 2004, a friend invited him to go to Dirty D's.  He arrived at 9:00 p.m.  Ware went outside because it was smoky inside.  He saw eight or nine people in the parking lot, and the lighting was

sufficient for him to see faces. (*Id.* at 164).  While standing near his truck, Ware saw an argument between four people.  Though he did not know any of the four people, he recognized them as people who had testified that day.  He saw Smith approach the group and say that no one could mess with his father.  Smith said,  "You're not going to talk to my daddy like that, bitch ass nigger." (*Id.* at 168).  Smith was directing the comment to Woodard.  Ware saw Smith run down the street and return with a black automatic gun.  Ware identified State's Exhibit 34 as being similar to the weapon used by Smith. (*Id.* at 172).  Ware saw Smith cock the gun and hit Woodard in the face with the gun. (*Id.* at 173).  Ware saw the Complainant running down Pinemont, and Smith was running after the Complainant and shooting at him.  (*Id.* at 177).  Smith fired about three shots, and Ware saw the Complainant fall near the tire shop.  Smith then ran back into the crowd.  Ware did not see anyone other than Smith with a gun that night. (*Id.* at 180).  Ware thought that Smith had killed the Complainant for no reason at all.  Ware never saw the Complainant fighting with anyone, and he never had a weapon.  He saw that the Complainant was bleeding from the mouth, nose, and ears.  When Ware got home, he realized there was a bullet hole in his headlight.  Ware returned to Dirty D's and told the police what he had seen. (*Id.* at 184). Ware testified that he never talked to the police after that day.

On cross-examination, counsel asked Ware when he first spoke to prosecutors; whether his interview with the police was tape recorded; whether he was ever asked by the police to identify the shooter; whether he was ever shown a photo-spread; how he described the shooter to police; how he learned the name "Maurice;" how often he went to Dirty D's; and whether he was sure that Smith had done the shooting.

Kathleen Mangum testified that she was forty-nine years old and worked as a bartender at Dirty D's. (Reporter's Record, Vol. V, p. 218). She had been working at Dirty D's for one and one-half years. She had been dating the Complainant since 2001. She did not witness the shooting. While inside the club, she never saw any problems. (*Id.* at 220). The Complainant had been sitting near her and having a drink. He left about 10:30 or 11:00. (*Id.* at 221). She saw Smith at Dirty D's, and he left just before the confusion started. She never saw anyone with a weapon that night.

On cross-examination, counsel asked how long the Complainant was at the bar and how much he had to drink.

Larry Baimbridge testified that he was an officer with the HPD. (Reporter's Record, Vol. V, p. 226). He was dispatched to a homicide at 3535 Pinemont at 11:54 p.m. on August 11, 2004. (*Id.* at 231). His partner was Officer Phil Yochum. Sergeant Baimbridge testified that it was uncommon to bag everyone's hands at a crime scene. When he arrived at the scene, the potential suspect was not present, so no one's hands were bagged. (*Id.* at 237). Sergeant Baimbridge went to Ben Taub Hospital to examine the Complainant's body.

Sergeant Baimbridge met with Woodard at the Homicide Division. (*Id.* at 246). When Sergeant Baimbridge and Woodard reached Sergeant Baimbridge's cubicle, Sergeant Baimbridge asked Woodard to pull up Officer Yochum's chair from an adjacent cubicle. (*Id.* at 247). Sergeant Baimbridge heard Woodard say, "Well, there's the guy right there." (*Id.* at 247). Woodard was pointing to a picture of Smith that was on Officer Yochum's desk. Sergeant Baimbridge did not know that the photograph was on the desk. Sergeant Baimbridge then took Woodard's written statement. Sergeant Baimbridge identified State's Exhibit No. 40 as the photo-spread he prepared. The photograph spread consists of photographs of the suspect and five other fill-ins that are similar

in appearance. (*Id.* at 256). Sergeant Baimbridge testified that Dsouza identified Smith as the shooter. Sergeant Baimbridge identified State's Exhibit 34 as a Delta Elite Colt, which is a large caliber semi-automatic weapon. (*Id.* at 259). The weapon was a deadly weapon capable of causing the injuries sustained by the Complainant. Sergeant Baimbridge testified that it is common for witnesses to prefer not to get involved. He testified that he had no reason to believe that more than one shooter was involved or that more than one gun was involved. (Reporter's Record, Vol. VI, p. 54).

On cross-examination, counsel asked if some witnesses are potential suspects; whether he recorded his interview with Ware; whether he interviewed Donna Cole; whether he saw a sharp object that could have been used as a weapon; the description Ware gave; whether the gun had been removed from the scene; whether the officers checked in the dumpster for the weapon; whether he ever investigated the inside of Dirty D's; and whether he investigated a separate blood trail.

Philip Yochum testified that he was an officer with the Houston Police Department. (Reporter's Record, Vol. VI, p. 60). On August 11, 2004, he was working with Sergeant Baimbridge on a homicide investigation at 3535 Pinemont. Officer Yochum investigated the damage to the blue GMC truck. Officer Yochum testified that he incorrectly noted that the owner of the truck was Albert Daniel Jackson. He later learned that the owner of the truck was Bryan Ware. (*Id.* at 65). During the course of his investigation, Officer Yochum never had any reason to believe there was more than one shooter. (*Id.* at 67). He had no reason to investigate the inside of Dirty D's because the shooting took place in the parking lot.

On cross-examination, counsel asked if he made a mistake as to the owner of the blue pick-up truck; whether swabs were taken from blood droplets on the scene; and whether he saw sharp objects in the parking lot.

Darrell Stein testified that he was a firearms examiner with the Houston Police Department firearms laboratory. (Reporter's Record, Vol. VI, p. 78). He examined firearms and firearms-related evidence, such as bullets and casings, to determine if the fired evidence items were fired from a particular firearm. (*Id.* at 79). He determined that the shell casings recovered from the scene were fired from the same weapon, a semi-automatic handgun. (*Id.* at 86). He testified that State's Exhibit 34 was a Delta Elite, 10mm auto pistol, and the casings recovered at the scene were consistent with the type of ammunition that would be fired from that weapon. (*Id.* at 87). He explained that the location of casings does not mean that that was where the person was standing when they fired the weapon.

On cross-examination, counsel asked if he could identify the shooter; how far the bullet could travel; and the type of testing he performed on the casings.

The defense called Michael Malone, an officer with the HPD. He testified that he interviewed Donna Cole on August 11, 2004, and she said she heard six to eight shots fired. She never said that she saw the shooting; and she never said that she saw the shooter drive off.

## IV.    The Claim Based on Sufficiency of the Evidence

### (Grounds 1 & 2)

Smith challenges the legal and factual sufficiency of the evidence to support the conviction for murder.

To review the legal sufficiency of the evidence, a federal court must consider whether, viewing all the evidence "in the light most favorable to the prosecution, any rational trier of fact could have found the existence of facts necessary to establish the essential elements of the offense beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 318-19 (1979). Credibility choices and conflicting inferences are to be resolved in favor of the factfinder. *United States v. Cyprian,* 197 F.3d 736, 740 (5th Cir. 1999), *cert. denied,* 531 U.S. 822 (2000). To determine whether the evidence is constitutionally sufficient to support the conviction, a court must examine whether the evidence satisfied the "substantive elements of the criminal offense as defined by state law." *Brown v. Collins,* 937 F.2d 175, 181 (5th Cir. 1991) (quoting *Jackson,* 443 U.S. at 324 n.16). The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. A reasonable trier of fact must be able to find that the evidence, whether direct or circumstantial, and all reasonable inferences, established guilt beyond a reasonable doubt. *United States v. Salazar,* 958 F.2d 1285, 1294 (5th Cir.), *cert. denied,* 506 U.S. 863 (1992).

The indictment alleged:

> IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:
> The duly organized Grand Jury of Harris County, Texas, presents in the District Court of Harris County, Texas, that in Harris County, Texas, JOHN PAYNE SMITH, hereafter styled the Defendant, heretofore on or about AUGUST 11, 2004, did then and there unlawfully, intentionally, and knowingly cause the death of AMBROSE CARPER, hereinafter called the Complainant, by SHOOTING THE COMPLAINANT WITH A DEADLY WEAPON, NAMELY A FIREARM. It is further presented that in Harris County, Texas, JOHN PAYNE SMITH, hereafter styled the Defendant, heretofore on or about AUGUST 11, 2004, did then and there unlawfully intend to cause serious bodily injury to AMBROSE CARPER, hereinafter called the Complainant, and did cause the death of the Complainant by intentionally and knowingly committing an act

> clearly dangerous to human life, namely BY SHOOTING THE COMPLAINANT WITH A DEADLY WEAPON, NAMELY A FIREARM.
> . . .
> AGAINST THE PEACE AND DIGNITY OF THE STATE.

*Ex parte Smith,* Application No. 70,761-01 at 80.

Any alleged inconsistencies in the witnesses' testimony concern the credibility and weight to be given certain testimony. *See Lancon v. State,* 253 S.W.3d 699, 705-07 (Tex. Crim. App. 2008). The jury is the exclusive judge of the credibility of the witnesses and of the weight to be given testimony. *Herrero v. State,* 124 S.W.3d 827, 833 (Tex. App. - Houston [14th Dist.] 2003, no pet.) (citing TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979), and *Garcia v. State,* 919 S.W.2d 370, 382 n.6 (Tex. Crim. App. 1996) (per curiam)).  The reviewing court resolves inconsistencies in testimony in favor of the jury's verdict. *Id.*  On this record, the jury was rationally justified in concluding that Smith was guilty of murder, beyond a reasonable doubt. *See Brooks,* 323 S.W.3d at 902.

Bridgit Sims testified that at approximately 11:30 p.m., she stepped out into the parking lot and, while standing near the door to Dirty D's, she saw Duke, Woodard, and Dsouza talking in the parking lot.  She then saw the Complainant running along the back of the parking lot, and Smith was pointing a gun at him and shooting. (*Id.* at 29).  Sims testified that the parking lot was well-lit and that she could see what was happening.  She never saw the Complainant with a gun.  She clearly saw Smith with a gun in his hand, and she saw him shoot it at the Complainant.  (*Id.* at 32).  Smith fired three shots, and the Complainant collapsed in front of the tire shop.  (*Id.* at 33).  Sims approached the Complainant and saw that he was bleeding and gasping for breath.  (*Id.* at 34).  She testified that

Smith was the only person in the parking lot with a gun.  She never saw anyone else with any type of weapon.  (*Id.* at 38).

Kesha Dsouza testified that she saw Smith carrying a big silver gun.  Dsouza testified that State's Exhibit 34 looked liked the gun Smith was holding.  (*Id.* at 152).  Smith asked who was messing with his dad.  Smith reached over and struck Woodard on the cheek with the gun.  (*Id.* at 155).  Duke grabbed Dsouza by the hair and pushed her against the wall and hit her on the nose.  (*Id.* at 156).  She heard gunshots.  She looked up and saw Smith running through the parking lot and shooting.  (*Id.* at 159).  Dsouza thought Smith was shooting at her brother, Woodard.  She recognized Smith because she had just seen him in the doorway of Dirty D's.  Dsouza testified that she never saw anyone else with a gun that night.  (*Id.* at 161).

Dr. Dwayne Wolf, the medical examiner, testified that the cause of death was a gunshot wound to the back.  Donna Cole testified that she saw Smith go to a burgundy car and return with a big silver gun in hand.  Again, Smith said no one was going to "f—k" with his daddy.  Cole saw the Complainant pass by Smith.  The Complainant made a gesture with his hands to show that he did not have a weapon.  Smith followed the Complainant and shot him.  (*Id.* at 252-53).  Cole did not know if the Complainant and Smith exchanged any words.  She saw Smith fire several random shots, then he fired at the Complainant.  She saw the Complainant fall to the ground.

A rational jury could have found all the elements of murder beyond a reasonable doubt.  The record discloses legally and factually sufficient evidence that Smith used a gun that was capable of causing death or serious bodily injury to the Complainant.  The evidence was sufficient to support Smith's conviction for murder.  Smith is not entitled to habeas relief on his sufficiency-of-the-

evidence claim. *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993), *cert. denied*, 510 U.S. 1141 (1994).

Under Texas law, intermediate appellate courts have the authority to review fact questions in criminal cases. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). This "factual sufficiency" review of the evidence is broader than a "legal sufficiency" challenge under *Jackson v. Virginia*, 443 U.S. 307 (1979). *Id.* Instead of viewing the evidence in the light most favorable to the prosecution and determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," a factual sufficiency inquiry views all the evidence to determine whether the verdict "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Id.* The power of state appellate courts to review the factual sufficiency of the evidence derives from Texas statutory and constitutional authority. *Id.* at 129-30; *Bigby v. State*, 892 S.W.2d 864, 874-75 (Tex. Crim. App. 1994). However, while Texas has permitted factual sufficiency reviews, under authority derived from Texas law, there is no corresponding federal right to such reviews under the United States Constitution. Under settled Fifth Circuit authority, a state may impose a more exacting standard for determining the sufficiency of the evidence, but challenges to state convictions under § 2254 need only satisfy the *Jackson* standard. *West v. Johnson*, 92 F.3d 1385, 1394 (5th Cir. 1996); *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir. 1990); *Jones v. Butler*, 864 F.2d 348, 361 (5th Cir. 1988). The Texas Court of Criminal Appeals recently determined that there is no meaningful distinction between the factual sufficiency standard of *Clewis v. State,* 922 S.W.2d 126 (Tex. Crim. App. 1996), and its subsequent line of cases, and the legal sufficiency standard of *Jackson v. Virginia,* 443 U.S. 307 (1979). *See Brooks v. State,* 323 S.W.3d 893, 894 (Tex. Crim. App. 2010). Guided by *Brooks,* Texas courts now apply the *Jackson*

legal sufficiency standard of review to a factual sufficiency challenge. *See id.* Texas courts would therefore construe Smith's factual sufficiency challenge as a legal sufficiency challenge. Smith's claim attacking the factual sufficiency of the evidence is not cognizable in federal habeas proceedings.

## V.     The Claims Based on Trial Court Error

The role of federal courts in reviewing habeas corpus petitions by prisoners in state custody is exceedingly narrow. A person seeking federal habeas corpus review must assert a violation of a federal constitutional right. *Lowery v. Collins,* 988 F.2d 1354, 1367 (5th Cir. 1993). Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *West v. Johnson,* 92 F.3d 1385, 1404 (5th Cir. 1996). In the course of reviewing state proceedings, a federal court does not sit as a super state appellate court. *Dillard v. Blackburn,* 780 F.2d 509, 513 (5th Cir. 1986).

The prospect of federal courts granting habeas corpus relief to state prisoners has been further limited by the Antiterrorism and Effective Death Penalty Act of 1996. The new provisions of Section 2254(d) provide that an application for a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See Williams v. Taylor,* 529 U.S. 362, 402-03 (2000); *Childress v. Johnson,* 103 F.3d 1221, 1224-25 (5th Cir. 1997). The statutory

provision requires federal courts to be deferential to habeas corpus decisions on the merits by state courts. *Moore v. Cockrell,* 313 F.3d 880, 881 (5th Cir. 2002).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991). A petitioner is entitled to federal habeas relief due to trial error only if such error had a substantial and injurious effect or influence on the verdict. *Brecht v. Abrahamson,* 507 U.S. 619, 637-38 (1993). [U]nder *Brecht,* a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict. It must have had a substantial effect or influence in determining the verdict. *Mayabb v. Johnson*, 168 F.3d 863, 868 (5th Cir. 1999). To be entitled to federal habeas relief due to a trial error, petitioner must show the error actually prejudiced him. *Brecht*, 507 U.S. at 637. Moreover, a federal habeas court does not sit in review of a state trial court's evidentiary rulings. *Derden v. McNeel,* 978 F.2d 1453, 1458 (5th Cir. 1992). Such rulings will mandate habeas relief only when the error is so extreme that it constitutes a denial of fundamental fairness. *Little v. Johnson,* 162 F.3d 855, 862 (5th Cir. 1998). The erroneous admission of prejudicial evidence "does not justify habeas relief unless the evidence played a 'crucial, critical, and highly significant' role in the [verdict]." *Jackson v. Johnson,* 194 F.3d 641, 656 (5th Cir. 1999).

The could will consider each of Smith's claims based on trial court error.

**A.    Improper Use of Commitment Questions**

**(Ground 3A)**

Smith argues that the trial court prejudiced and inflamed the minds of the jury during voir dire by using hypothetical situations and committing the jury to a specific set of facts before the

presentation of any evidence at trial. He claims that this caused irreparable harm. He argues that commitment questions and the use of hypotheticals that rely on a specific set of facts is improper because the jury is committed to a set of facts before the presentation of any evidence at trial.

The trial court has broad discretion over the process of selecting a jury. *Allridge v. State,* 762 S.W.2d 146, 167 (Tex. Crim. App. 1988); *Ewing v. State,* 157 S.W.3d 863, 866 (Tex. App. - Fort Worth 2005, no pet.). The propriety of a particular voir dire question is reviewed under an abuse-of-discretion standard. *Barajas v. State,* 93 S.W.3d 36, 38 (Tex. Crim. App. 2002); *Allridge,* 762 S.W.2d at 167; *Vann v. State,* 216 S.W.3d 881, 884 (Tex. App. - Fort Worth 2007, no pet.). A commitment question is one that commits a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact. *Standefer v. State,* 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). It is generally improper to ask a commitment question during voir dire because it amounts to an improper attempt to bind a juror. *Lydia v. State,* 117 S.W.3d 902, 905 (Tex. App. - Fort Worth 2003, pet. ref'd). But some commitment questions are proper. *Id.; see Standefer,* 59 S.W.3d at 181-83.

For instance, counsel may ask prospective jurors whether they can follow the law when it requires a certain type of commitment from jurors and when the question states only the facts required to establish a challenge for cause. *Standefer,* 59 S.W.3d at 181-82 (illustrating that counsel may ask jurors whether they can consider community supervision when law requires jurors to consider full range of punishment); *Vann,* 216 S.W.3d at 884-85. However, when "the law does not require the commitment, a commitment question is invariably improper." *Standefer,* 59 S.W.3d at 181. Thus, the determination of whether a question is an improper commitment question is a three-part test: (1) is the question a commitment question; (2) could a possible answer to the question

produce a valid challenge for cause because it would show that a juror would not follow the law; and

(3) does the question only contain the facts required to make such a challenge. *See id.* at 182-83;

*Tijerina v. State,* 202 S.W.3d 299, 302 (Tex. App. - Fort Worth 2006, pet. ref'd) (op. on reh'g).

"[T]he purpose for prohibiting improper commitment questions by either the State or the defendant

is to ensure that the jury will listen to the evidence with an open mind - a mind that is impartial and

without bias or prejudice - and render a verdict based upon that evidence." *Sanchez v. State,* 165

S.W.3d 707, 712 (Tex. Crim. App. 2005).

First, Smith complains that Judge Barr suggested that Smith had been accused of the

criminal offense of murder.  Smith complains that this committed the jury to an improper set of facts

before the presentation of any evidence at trial.  The record shows that the trial court addressed the

venire panel as follows:

> The defendant in this case has been accused of a criminal offense, and
> the offense that he has been accused of is the offense of murder.  The
> lawyers will talk to you a little bit more about exactly how he is
> charged and explain some different things that they think might come
> up.  Caveat on the front end, they will give you examples about
> things.  Folks, please do not think that they are trying to tell you the
> facts of the case.  They are not allowed to do that.  So, any examples
> that they give you are just to illustrate certain legal principles.  They
> are not allowed to talk to you about the facts of the case.  Sometimes
> we'll have jurors say, "well, you know, how old is that witness?"
> Let's say if it's something that involves an allegation with a child or
> something.  "Well, how old is the child?"  They can't tell you that.
> They can't tell you the relationships between people.  You'll hear all
> that when the witnesses come in, but they can't tell you about that
> ahead of time.  So, please don't think that they're giving you any
> evidence in the case.  In every criminal case when somebody gets
> accused, that's simply what it is.  It's an accusation.  It does not mean
> that the accusation is true.  Think about that.  Have you ever been
> accused of something you didn't do?  Just because somebody is
> charged with an offense, does not mean that they are guilty.  In fact,
> just the opposite.  When somebody is accused of an offense, they still

have what's called the presumption of innocence.  So, even though
there's an accusation of this defendant basically, it's like a finger
pointing.  The State's pointing a finger saying, "We claim you did
something."

(Reporter's Record, Vol. II, pp. 13-14).

The court's comment made to the venire was directed at clarifying the legal issue.  The

comments did not taint the presumption of innocence nor did they vitiate Smith's right to an

impartial jury trial.

Smith next complains that the prosecutor made improper use of a hypothetical situation.  The

prosecutor then asked if the venire would hold the State to a higher standard if no weapon was

produced.  Smith argues that this question committed the jury to a specific set of facts before the

presentation of any evidence at trial because the murder weapon was never recovered.

The prosecutor had the following exchange with the venire during voir dire:

| | |
|---|---|
| MS. MITCHELL: | Okay.  I want to talk to you about direct evidence versus circumstantial evidence. Everybody's heard the term circumstantial evidence.  Okay.  Let me pick on somebody -- Mr. Lewis, you're No. 17? |
| VENIREPERSON: | 17. |
| MS. MITCHELL: | Okay.  What does circumstantial evidence mean to you?  One of those legal terms, right? |
| VENIREPERSON: | Yeah. |
| MS. MITCHELL: | Okay.  Who here has an idea?  What's circumstantial evidence? |
| VENIREPERSON: | Exactly -- that could have been, but it's not proven. |

| | |
|---|---|
| MS. MITCHELL: | Okay. An eyewitness -- for instance, if Mr. Osborne walks over and shoots you, again purely hypothetical, and Ms. Garner here sees it, she would come testify and say, "I saw Mr. Osborne shoot Mr. Lewis and this is what happened." That would be district [sic] evidence, eyewitness testimony, okay? Now let me change up the hypothetical. Let's assume Mr. Marshall is standing outside after jury duty waiting to catch the bus and he sees -- I'm going to butcher your name -- Mr. Krystyniak -- he sees Mr. Krystyniak running really, really fast and he sees Mr. McKinney chasing after him with a gun in his hand. They go down an ally [sic]. He hears a gunshot. He then sees Mr. Krystyniak run back out -- I'm sorry. Not Mr. Krystyniak -- Mr. McKinney run back out with the gun. He goes in and he sees Mr. Krystyniak laying there and he's been shot, okay? Mr. Airheart, No. 41. What do you think happened? |
| VENIREPERSON: | It would be just assumption. |
| MS. MITCHELL: | But what do you think happened? |
| VENIREPERSON: | I would think that he shot him. |
| MS. MITCHELL: | Is that what you would think, Mr. Marshall if you went there and -- oh, and by the way, it was a dead-end ally[sic] and there was nobody else around. |
| VENIREPERSON: | That's what you would think. |
| MS. MITCHELL: | That's what you would think, right? Now, you didn't see it happen, right? |
| VENIREPERSON: | Right. |
| MS. MITCHELL: | You didn't see Mr. McKinney shoot Mr. Krystyniak, right? |

| | |
|---|---|
| VENIREPERSON: | Right. |
| MS. MITCHELL: | But can you, in your mind, feel fairly confident that's probably what happened? |
| VENIREPERSON: | Right. |
| MS. MITCHELL: | Okay. And I'm not suggesting to you that that is. That's just an example of circumstantial evidence where a person may not see what happened but you can surmise from the evidence beyond a reasonable doubt what did occur. Fair enough? The reason I point that out is, again, the law doesn't say we have to bring you direct evidence. Could be direct evidence, could be circumstantial evidence as long as you're satisfied beyond a reasonable doubt that the defendant's guilty. Fair enough? Can everybody consider that? Is there anybody that thinks, "Nope. I cannot consider that type of evidence?" |

(Reporter's Record, Vol. III, pp. 40-43).

Smith argues that the prosecutor's questions asked for a commitment from the venire members. The questions did not ask the venire panel to commit to convicting based on circumstantial evidence. The questions sought to ferret out biases against the law that allows conviction based on circumstantial evidence. That is, as phrased, the questions did not ask the jury panel to promise to convict based on circumstantial evidence. They asked whether the jury would refuse to convict based on circumstantial evidence. This court determines that the State's questions properly inquired into a bias against a portion of the law upon which the State is entitled to rely. The trial court therefore did not abuse its discretion in overruling Smith's objections.

Smith next complains that the prosecutor asked the venire if anyone would be troubled by the fact that the prosecutor did not present a confession or witness statement.  Smith argues that this committed the jury to a specific set of facts before the presentation of any evidence at trial.

It is within the sound discretion of the trial court to determine whether a hypothetical commitment question is properly being used to explain the law or being used to improperly commit potential jurors to the specific facts of the case. *See Atkins v. State,* 951 S.W.2d 787, 790 (Tex. Crim. App. 1997).  Under the circumstances presented here, this court cannot conclude that the trial court abused this discretion in overruling Smith's objection and permitting the commitment question.

Smith complains that the prosecutor said she would commit the venire one way or another. He argues that this statement was improper.

The prosecutor had the following exchange with a member of the venire:

| | |
|---|---|
| MS. MITCHELL: | So, be honest with me.  If a police officer walks in here and you see his uniform and you know he's a police officer, are you going to start him out a little bit lower? |
| VENIREPERSON: | Just with the past recent deal happening, it's – there's kind of - probably about the same. But, you know, they have been lying to - me and I've had some problems with them.  So, there is some issue. |
| MS. MITCHELL: | And I appreciate your honesty.  And unfortunately, you just used one of those words that you're not allowed to use during jury selection which is "probably."  We have to commit you one way or another; and it is okay if you are going to start police officers out lower until they earn credibility with you or if you're going to start them out equally. Whatever your answer is, I just need it. |

> VENIREPERSON: I would probably start them out equally but question them in my head more than someone else walking in and sitting down.
>
> MS. MITCHELL: But can you assure me you'll start them out equally?
>
> VENIREPERSON: Yes.
>
> MS. MITCHELL: All right. . . .

(Reporter's Record, Vol. II, pp. 79-80).

The record shows that the prosecutor did not ask a commitment question. Instead, she was asking the venire person for a definite answer to her question of whether he would be biased against police officers. The prosecutor said that the venire person would have to commit to either a "yes" or "no" answer.

Smith has not shown that the mentioned evidentiary rulings violated a specific constitutional right or that they were so egregious that they rendered his trial fundamentally unfair.

Smith is not entitled to habeas relief on this claim.

**B.    Improper Questions by Prosecutor**

**(Ground 3B)**

Smith complains the court abused its discretion when the Prosecutor was allowed to ask commitment questions over trial counsel's objection.

This court previously addressed Smith's claim of trial court error based on improper commitment questions. Smith now asserts a claim of trial court error based on the court's decision to overrule counsel's objection. For the reasons set forth in section V-A, this claim of trial court error lacks merit.

### C.     Violation of the Witness Rule

### (Ground 3C)

Smith asserts that the trial court abused its discretion when the court failed to order a mistrial or charge the State's witnesses with contempt of court when the State's witness, Bryan Ware, testified that he learned the names of the other witnesses when they were all conversing in the witness room. Smith also states that it was brought to the attention of the court and to the Prosecutor and the Defense Attorney that the witnesses all came into the hallway discussing the case at bar. Smith argues that once the rule is invoked, witnesses should not be allowed to hear any testimony in the case or talk to any other person about the case without the court's permission. TEX. C. CRIM. PROC. ANN. art. 36.05, 36.06. Smith argues that in the instant case, the Rule was invoked, and the State should have seen to it that the witnesses were sequestered properly.

The procedure of excluding witnesses from the courtroom is commonly called putting the witnesses "under the rule." The purpose of placing witnesses under the rule is to prevent the testimony of one witness from influencing the testimony of another, consciously or not. *Routier v. State,* 112 S.W.3d 554, 590 (Tex. Crim. App. 2003), *cert. denied,* 541 U.S. 1040 (2004); *Bell v. State,* 938 S.W.2d 35, 50 (Tex. Crim. App. 1996), *cert. denied,* 522 U.S. 827 (1997).

Several articles in Chapter 36 of the Code of Criminal Procedure speak to witnesses under the rule. The main features of the procedure are stated in Articles 36.05 and 36.06. The former says, "[I]n no case where the witnesses are under rule shall they be allowed to hear any testimony in the case." The latter says, "Witnesses, when placed under rule, shall be instructed by the court that they are not to converse with each other or with any other person about the case except by permission of

the court, and that they are not to read any report of or comment upon the testimony in the case while under rule."

First, Smith refers to an incident where one of the State's witnesses, Maurice Woodard, introduced himself by name to another witness, Bryan Ware. Smith asserts that this introduction *alone* violated the Rule. The record shows that once the court administered the oath to Bryan Ware, the prosecutor asked him if he had spoken to any of the witnesses. (Reporter's Record, Vol. V, p. 156). Ware denied speaking to any other witness in the witness room. He also said that he did not know any of the other witnesses, including Kesha Dsouza, Maurice Woodard, Bridget Sims, and Donna Cole. (*Id.*). On cross-examination, counsel asked Ware how he knew Donna Cole. Ware responded, "We introduced ourselves in the courtroom — witness room." Counsel asked when this took place, and Ware responded, "Yesterday." (Reporter's Record, Vol. V, p. 216). The purpose of placing a witness under the rule is to prevent that witness from being influenced in his testimony by the testimony of another witness. The question in assessing the harm of allowing Bryan Ware to testify is whether he was influenced in his testimony by the testimony he heard. Here, Bryan Ware did not state that he heard the testimony of any other witnesses. Instead, he explained that all of the witnesses in the witness room had introduced themselves the previous day. Nothing in the record shows that Ware's testimony was influenced by his hearing the testimony of any other witness. This court cannot say from this record that the trial court's purported error in allowing Ware to testify had a substantial and injurious effect or influence in determining the jury's verdict. The error did not affect Smith's substantial rights.

Second, Smith cites a statement by the prosecutor to the trial court that a non-witness may have described some of the in-court testimony to her sister, who was a witness. The prosecutor

advised the court that some witnesses and family members observed Brenda Maxey telling her twin

sister, Linda Williams, what was happening inside the courtroom.  (Reporter's Record, Vol. V, pp.

108-109).  The prosecutor asked that Maxey be excluded from all further proceedings.  The court

then advised Ms. Maxey that in an abundance of caution, she could not be present while witnesses

were testifying. (*Id.* at 110).  The record shows that Linda Williams was not called as a witness by

either the State or the defense.  Because Williams did not testify, whether Williams was influenced

by Ms. Maxey's summarization of testimony is irrelevant.  Nothing in the record shows that any

purported error of the trial court had a substantial and injurious effect or influence in determining

the jury's verdict.  The error did not affect Smith's substantial rights.  Smith is entitled to federal

habeas relief due to trial error only if such error had a substantial and injurious effect or influence

on the verdict.  Even if the state trial court erred, federal habeas relief may be granted only under

exceptional circumstances when the evidentiary ruling violates a specific constitutional right or is

so egregious that it renders the trial fundamentally unfair.  Smith has not shown that the mentioned

evidentiary rulings violated a specific constitutional right or that they were so egregious that they

rendered his trial fundamentally unfair.

     Smith is not entitled to habeas relief on this claim.

### D.      Improper Use of Leading Questions

###       (Ground 3D)

     Smith asserts that the trial court abused its discretion when the prosecutor was allowed to

lead the State's witness over objection.  A leading question either suggests the answer sought by the

interrogator or puts words into the mouth of the witness to be "echoed back" in reply. *Mega Child*

*Care, Inc. v. Tex. Dep't of Protective & Reg. Servs.,* 29 S.W.3d 303, 307 (Tex. App. - Houston [14th

Dist.] 2000, no pet.) (citing *Myers v. State,* 781 S.W.2d 730, 733 (Tex. App. - Fort Worth 1989, pet. ref'd)).

Rule 611(c) proscribes leading questions on direct examination "except as may be necessary to develop the testimony of the witness ." TEX. R. EVID. 611(c); *Mega Child Care, Inc.,* 29 S.W.3d at 307 (citing TEX. R. EVID. 611(c)). Rule 611 thus continues well-settled law recognizing the "sound discretion" vested in trial courts to permit leading questions. *See Wyatt v. State,* 23 S.W.3d 18, 28 (Tex. Crim. App. 2000); *Mega Child Care, Inc.,* 29 S.W.3d at 308. To establish that the trial court abused its discretion, Smith must demonstrate that the claimed leading questions resulted in undue prejudice. *See Wyatt,* 23 S.W.3d at 28. It is essential that appellant have preserved error through a timely request that the trial court refused. *See Young v. State,* 137 S.W.3d 65, 69 & n.5 (Tex. Crim. App. 2004) (quoting text of TEX. R. APP. P. 33.1(a)). Even if we conclude that the trial court erred, this court may not reverse unless it concludes, from the record as a whole, that the error affected Smith's substantial rights. *James v. State,* 264 S.W.3d 215, 222 (Tex. App. - Houston [1st Dist.] 2008, pet. ref'd) (citing TEX. R. APP. P. 44.2(b)). Error affects a substantial right of an accused when it had a substantial and injurious effect or influence on the jury in determining its verdict. *Id.* (citing *Johnson v. State,* 43 S.W.3d 1, 3-4 (Tex. Crim. App. 2001)). When the trial court has sustained an appellant's objection and has instructed the jury to disregard, however, the instruction to disregard will generally cure any error, because the appellate court presumes that the jury complied with the instruction. *See Bermudez v. State,* 504 S.W.2d 868, 871 (Tex. Crim. App. 1974). Finally, an erroneous evidentiary ruling is harmless when other evidence on the same matter is admitted without objection from appellant. *James,* 264 S.W.3d at 222 (citing *Saldano v. State,* 232

S.W.3d 77, 102 (Tex. Crim. App. 2007); *Leday v. State,* 983 S.W.2d 713, 717-18 (Tex. Crim. App. 1998)).

Smith first complains that the prosecutor, Ms. Fowell, was allowed to ask a question and also answer it, using the witness to echo her reply. She stated, "What were ya'll doing, trying to protect each other?"

The prosecutor had the following exchange with Woodard:

> Q.   Did you get a pretty good look at him when you were this close?
>
> A.   Yes.
>
> Q.   What happened next?
>
> A.   Well, it's like a lot of commotion started happening after that, you know. I know I was being pulled back in the club.
>
> Q.   Okay.
>
> A.   Kept pulling me back in the club.
>
> Q.   Okay. So how close to the door were you?
>
> A.   How close to the door? I think I still maintained that six feet distance, you know.
>
> Q.   Okay. Now when you say someone was pulling you, show me what you mean. How was someone pulling you?
>
> A.   I was being pulled, like, by my clothes -- by my shirt like this, and I was being pulled by my arm.
>
> Q.   So what did you do in response to him walking up and waiving [sic] a gun around?
>
> A.   Well I was just -- at that point, I was trying to pull my little sister behind me and she was pulling me behind her and I kept, you know, kept pulling each other behind each other.

> Q.      What were ya'll doing, trying to protect each other?
>
> A.      Yeah, of course.
>
> MR. JUSTIN:        That's leading, Judge.
>
> THE COURT:        Overruled. That's fine.

(Reporter's Record, Vol. V, pp. 91-92).

To establish that the trial court abused its discretion, Smith must demonstrate that the claimed leading questions resulted in undue prejudice. Smith has not made this showing. The purported leading question relating to whether Dsouza and Woodard were protecting each other was cumulative. Dsouza had testified that she initially thought Smith was shooting at Woodard, her brother. Woodard testified that Dsouza was his younger sister, and he was concerned for her safety. He testified that he felt relieved when he saw her after the shooting. Even if this court concluded that the trial court erred, this court may not reverse unless it concludes, from the record as a whole, that the error affected Smith's substantial rights. Smith has not made the necessary showing.

Smith asserts that the prosecutor led Mr. Bryan Ware's testimony by asking and answering: "And you have not talked to any of the witnesses even though you were just sworn in right now, right?"

Smith next complains that the prosecutor lead her witness over objection by asking and leading: "And how did you see them getting physical with each other? What did you see Duke do?" The record shows that the prosecutor had the following exchange with Bryan Ware:

> Q.      And do you -- did you recognize the other people within that
>          group?
>
> A.      Yes.

Q.      How many other men were there?

A.      At least two.

Q.      How many other females?

A.      Two.

Q.      Was the argument verbal or physical or both?

A.      Both.

Q.      Who did you see getting physical with each other, the males, the females, both?

A.      The males.

Q.      And how did you see them getting physical with each other? What did you see Duke do?

MR. JUSTIN:        Excuse me, judge.  That's assuming he did anything.  Leading.

THE COURT:        If anything; objection's overruled.

Q.      (BY MS. MITCHELL) What did you see Duke doing if anything?

A.      Pushing and shoving, trying to get at the other guy.

Q.      And what was the other guy doing, if anything?

A.      Pushing and shoving back till they got to the front door.

(Reporter's Record, Vol. V, p. 166).

As noted, to establish that the trial court abused its discretion, Smith must demonstrate that the claimed leading questions resulted in undue prejudice.  Smith has not made this showing.  The purported leading question relating to whether Duke was doing anything was cumulative.  Woodard had testified that he and Duke had had a very heated verbal exchange.  Woodard testified that Duke

had been holding a beer bottle in a threatening manner, and that Woodard retrieved a knife because he felt threatened.  Donna Cole testified that as she neared the front door to Dirty D's, Duke knocked her down to the ground.  When she stood up, she realized that she had sustained a cut to her thigh. Dsouza testified that Duke pushed her against the wall and struck her on the nose.  Even if this court concludes that the trial court erred, this Court may not reverse unless it concludes, from the record as a whole, that the error affected Smith's substantial rights.  Smith has not made the necessary showing.

### E.   Improper Admission of Hearsay Testimony
### (Ground 3E)

Smith complains that the trial court allowed hearsay evidence over objection, thereby abusing its judicial discretion.  Smith complains that Bridgit Sims was allowed to testify that she saw Duke's son at the club, over objection.  Smith notes that Sims said she did not know about Duke having any children.  Smith's asserts that his constitutional right to confrontation was violated when Bridgit Sims testified that she learned from someone else that Smith was Duke's son.  He also complains that Kesha Dsouza gave a statement to police based on hearsay.  Smith alleges that the trial court abused its discretion by admitting hearsay testimony into evidence over the defense's objection.

A criminal defendant has the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI.  Hearsay is an out-of-court statement offered at trial to prove the truth of the matter asserted. TEX. R. EVID. 801(d) (Vernon 2003).  Hearsay is not admissible absent an exception. TEX. R. EVID. 802 (Vernon 2003).  A court's "admission of hearsay evidence against a defendant implicates the Sixth Amendment's Confrontation Clause because the defendant is not afforded an opportunity to confront the out-of-court declarant." *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir.)

(citing *Ohio v. Roberts,* 448 U.S. 56, 63 (1980)), *cert. denied,* 546 U.S. 831 (2005).  The Supreme Court has held that "a hearsay statement against a defendant may be introduced if the statement bears sufficient 'indicia of reliability.'"  *Id.* (quoting *Ohio v. Roberts,* 448 U.S. at 66).  In order to show indicia of reliability, it must be shown that the statement either "falls within a 'firmly rooted' hearsay exception," or that the statement "is supported by 'particularized guarantees of trustworthiness.'" *Id.* (quoting *Idaho v. Wright,* 497 U.S. 805, 815-17 (1990)).

Whether an out-of-court statement is admissible under an exception to the hearsay rule is a matter within the trial court's discretion. *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).  Courts will reverse only if the trial court's decision to admit testimony is "so clearly wrong as to lie outside the zone within which reasonable persons might disagree." *Id.* A defendant's right to confront and cross-examine the witnesses against him under the U.S. Constitution's Sixth Amendment's Confrontation Clause is not implicated if a hearsay statement is non-testimonial in nature and bears adequate indicia of reliability. *Woods v. State,* 152 S.W.3d 105, 113-14 (Tex. Crim. App. 2004) (citing *Crawford v. Washington,* 541 U.S. 36 (2004)).  Statements that are testimonial in nature include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and [to] police interrogation" and do not include casual remarks made spontaneously to acquaintances. *Id.* at 114 (internal quotation marks omitted).  If the statement in question falls within a firmly rooted hearsay exception, reliability can be inferred and is even found to be per se reliable for Confrontation Clause analysis. *Guidry v. State,* 9 S.W.3d 133, 149 (Tex. Crim. App. 1999); *see also Crawford,* 124 S. Ct. at 1372-74 (suggesting that otherwise reliable non-testimonial hearsay falls outside scope of Sixth Amendment's Confrontation Clause).